# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

**MIGUEL SIERRA LUCIANO, et al.,**

    **Plaintiffs,**

    v.

**CONGAR INTERNATIONAL CORPORATION, et al.,**

    **Defendants.**

**Civil No. 16-2008 (ADC)**

## OPINION & ORDER

Before the Court are two motions for summary judgment. Crossclaim defendant Twin City Fire Insurance Company ("Twin City") moved for summary judgment against crossclaim plaintiff Congar International Corporation ("Congar"). **ECF No. 66.** Congar cross-moved for summary judgment against Twin City. **ECF No. 73**. For the reasons explained below, the Court **GRANTS** Twin City's motion and **DENIES** Congar's motion.

**I.   Undisputed Facts[1]**

This case arises from an employment discrimination suit filed by a group of former-Congar employees who were terminated on or around October 5, 2015 (the "employment

---

[1] Because the parties filed cross-motions for summary judgment, the Court must "evaluate each motion independently and determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assurance Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (citation and internal quotation marks omitted). The Court recites the undisputed material facts as mutually presented by the parties. *See* **ECF Nos. 66-2; 73-3; 73-4.**

dispute"). **ECF Nos. 66-2** at 1–2; **73-3** at 1; **73-4** at 1**.** The employees individually filed charges of discrimination with the Anti-Discrimination Unit of the Department of Labor ("ADU") and the Equal Employment Opportunity Commission ("EEOC") on October 8, 2015; December 15, 2015; December 18, 2015; and January 12, 2016.[2] **ECF Nos. 66-2** at 2; **73-3** at 1. Congar, through its General Counsel, became aware of the employees' discrimination claims on February 4, 2016. **ECF Nos. 66-2** at 2; **73-3** at 3. Congar informed its insurer, Twin City, of the employment dispute by a letter dated July 20, 2016. **ECF Nos. 66-2** at 3; **73-3** at 3; **73-7**. Twin City denied Congar's request for coverage in a letter dated January 4, 2017.[3] **ECF Nos. 73-4** at 5**; 73-9.**

## II.    Procedural History

The employees ultimately filed the underlying lawsuit against Congar and its then-unknown insurance company on June 1, 2016, and they filed an amended complaint on October 26, 2016, identifying Twin City as an additional defendant. **ECF Nos. 1, 21**. Congar asserted a crossclaim for breach of contract and declaratory judgment against Twin City based on Twin

---

[2] Congar's response to Twin City's statement of material facts does not address the accuracy of these dates; rather, it simply agrees that plaintiffs filed ADU and EEOC complaints. **ECF No. 73-3** at 1**.** Given that Congar has not clearly disputed the dates, the Court finds the dates undisputed. However, the dates as listed by Twin City and plaintiffs appear to contain a typographical error—several employees are described as having filed their claims with the EEOC and ADU on December 15, 20*16*, even though the complaint and amended complaint were both filed *before* December 15, 2016. *See* **ECF Nos. 1** at 3–4; **21** at 3–4; **66-2** at 2. The Court presumes this is a typographical error and the correct date of the employees' EEOC and ADU filings is sometime on or around December 15, 20*15*. The exact date of these December filings has no bearing on the outcome of the Court's ruling on summary judgment.

[3] Twin City does not address this fact in its statement of material facts, nor does Twin City address the accuracy the denial letter appended to Congar's motion for summary judgment. *See* **ECF No. 66-2.** However, Twin City's anticipation of Congar's argument that its denial of coverage was untimely under the Florida Claims Administration Statute suggests that it does not dispute that it first denied Congar's request for coverage in the January 4, 2017 letter. **ECF No. 66** at 13–14. Accordingly, the Court considers this fact and related document undisputed.

City's failure or refusal to indemnify and defend Congar in the employment dispute. **ECF No. 34** at 41–44. At the time Congar filed its crossclaim, Twin City had not formally denied coverage. Twin City responded to Congar's crossclaim with a counter crossclaim, seeking declaratory relief concerning its obligation to provide coverage for Congar for the claims asserted in the employment dispute and in separate state court proceedings related to Congar's October 5, 2015 reduction in force. **ECF No. 37** at 6–13. Congar responded, refuting Twin City's assertions and arguing that Twin City waived any defense against coverage when it failed to provide timely notice of its denial of coverage, taking until January 4, 2017, "more than five months" from Congar's notice of claim, to formally deny coverage under Florida's Claims Administration Statute, Fla. Stat. § 627.426. **ECF Nos. 44** at 9–10; **73** at 5.

Congar and the plaintiffs settled the underlying employment dispute out of court and stipulated to dismiss the plaintiffs' amended complaint with prejudice as to all defendants. **ECF Nos. 55, 57, 60**. Congar's crossclaim and Twin City's counter crossclaim are the only remaining claims before the Court. [4] Twin City subsequently filed for summary judgment, which Congar disputed and cross-moved for summary judgment. **ECF Nos. 66, 73.**

---

[4] After dismissing plaintiffs' complaint with prejudice, the Court ordered Congar and Twin City to show cause as to whether the Court still had jurisdiction over their crossclaims. **ECF No. 59**. The parties timely responded, asserting diversity jurisdiction. **ECF Nos. 61, 62.** The Court is satisfied it has diversity jurisdiction. *See* 28 U.S.C. § 1332(a). Twin City is an Indiana corporation with a principal place of business in Connecticut. **ECF No. 61** at 2. Congar is a foreign for-profit corporation authorized to conduct business in Puerto Rico and is a subsidiary of Altadis, USA, Inc., itself a subsidiary of ITG Holdings, USA, Inc., which is based in Florida. **ECF Nos. 34** at 41; **62** at 1. The parties agree that the amount in controversy is over $75,000; Congar identified the amount as upwards of $1.2 million dollars. **ECF Nos. 61** at 2**; 62** at 3.

At the heart of the parties' competing summary judgment motions is their disagreement over which policy applies to the employment dispute and whether Congar satisfied the applicable policy's notice requirements. Twin City argues that the 2015 policy applies because Congar's insurance claim arose in 2015, when the first of its former employees filed EEOC and ADU discrimination charges on October 8, 2015. **ECF No. 66** at 12. Twin City asserts that it is not obligated to indemnify Congar in the employment dispute because Congar failed to timely notify Twin City of the insurance claim pursuant to the terms of its 2015 policy. *Id.* at 12–13. According to Twin City, the 2015 policy required Congar to inform Twin City of its insurance claim within sixty days of the policy's January 31, 2016 expiration, i.e., by April 1, 2016. *Id.* at 4, 13. Although Congar's General Counsel became aware of the employment dispute within that reporting time frame, on February 4, 2016, Congar did not notify Twin City of the employment dispute until July 20, 2016. *Id.* at 5. Accordingly, Twin City asserts it properly denied coverage under the terms of the applicable policy.

Congar responded and cross-moved for summary judgment on the basis that the 2016 insurance policy controls, not the 2015 policy, because Congar, through its General Counsel, first learned of the claim in 2016. **ECF No. 73** at 3–4**.** Moreover, according to Congar, its notice to Twin City was timely under the 2016 policy because the policy bases the time for notice on when the General Counsel becomes aware of the claim. *Id.* at 4. Thus, Congar argues, under either policy Twin City wrongfully withheld coverage. In addition, Congar asserts application of the Florida Claims Administration Statute and the notice-prejudice rule as bars to Twin City's

coverage defense that Congar's notice under the 2015 policy, to the extent that policy applies, was untimely. *Id.* at 5–6.

## III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. United States Dept. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). Here, the parties do not dispute the underlying facts. Rather, their dispute centers on the proper interpretation and application of the insurance policies.

Next, the Court must determine which state's laws guide its interpretation of the disputed contractual provisions. "It is a black-letter rule that state substantive law supplies the rules of decision for a federal court sitting in diversity jurisdiction." *Lexington Ins. Co. v. General Accident Ins. Co. of Am.*, 338 F.3d 42, 46 (1st Cir. 2003) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). "Thus, the initial question involves which source of law should guide our interpretive efforts." *Id.* To determine what state law is relevant, the federal court applies the forum state's choice of law framework. *Id*; *accord In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 14 (1st Cir. 2012). In Puerto Rico, "the laws of the jurisdiction with the most significant contacts to the disputed issues will apply." *Allstate Ins. Co. v. Occidental Int'l, Inc.*, 140 F.3d 1, 3 (1st Cir. 1998) (citation and internal quotation marks omitted); *accord Rodríguez-Miranda v. Benin*, 829 F.3d

29, 43 n.18 (1st Cir. 2016). "'Among the contacts to consider are the parties' place of incorporation and of business, the place where the injurious conduct occurred, the place where the injury materialized, and the place where the relationship between the parties is centered.'" *Rodríguez-Miranda*, 829 F.3d at 43 n. 18 (quoting *Goya Foods, Inc. v. Unanue-Casal*, 982 F.Supp. 103, 107 (D.P.R. 1997) (JAF)).

Although the parties cite both Florida and Puerto Rico law, the parties identify Florida law as the appropriate choice of law to the extent there is a conflict. **ECF Nos**. **66** at 6–7; **73** at 11–12. The parties note that Florida law applies because the insured entity—Congar's parent corporation, ITG Holdings—is located in Ft. Lauderdale, Florida, where the policies were negotiated and issued. **ECF Nos. 66** at 7; **73** at 11. Neither the 2015 policy nor the 2016 policy contain a choice of law provision, but each policy incorporates several endorsements purportedly executed pursuant to Florida law, such as the "Florida Amendatory Endorsement," "Amend Mailing Address for Notice Endorsement Florida," "Florida Cancellation and Nonrenewal Endorsement," and "Florida Rule 69O-166.040" for "Availability of Consultative Services." **ECF Nos. 67** at 116, 121, 122, 125; **73-6** at 54, 59, 61, 64. However, the underlying injurious conduct is founded in a reduction in force that occurred in Puerto Rico and against Puerto Rican employees. But, the claims asserted by the employees are no longer part of the case. Thus, the only remaining "injury" arises from the paperwork enacted in Florida by a parent corporation based in Ft. Lauderdale, Florida. Accordingly, the Court agrees with the parties that Florida contract law governs this dispute.

"Generally, under Florida law, 'in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect.'" *Penzer v. Transportation Ins. Co.*, 545 F.3d 1303, 1306 (11th Cir. 2008) (per curiam) (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla. 2000)). "Policy terms are given their plain and ordinary meaning and read in light of the skill and experience of ordinary people." *Id*. (citing *Bethel v. Security Nat'l Ins. Co.*, 949 So.2d 219, 222 (Fla. Dist. Ct. App. 2006)). "'[I]f the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous.'" *Id*. (quoting *Auto-Owners*, 756 So.2d at 34) (second alteration in original). "Ambiguities are construed against the insurer." *Id.* (citing *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072, 1076 (Fla. 1998)).

## VI. Analysis

### A. Congar's Insurance Claim Falls Under the 2015 Policy.

The parties agree that the plaintiffs' underlying employment dispute substantively falls within the scope of the "Employment Practices Liability Coverage" for either insurance policy. *See* **ECF Nos. 66** at 2; **73** at 6, 13. Their disagreement lies in identifying *when* the plaintiffs' employment dispute presented an insurance claim and, in turn, in identifying which policy governs. The 2015 policy period ran from January 31, 2015, through January 31, 2016. **ECF No. 67** at 67. The 2016 policy period ran from January 31, 2016, through September 30, 2016. **ECF No. 73-6** at 1.

Both policies include an identical "Insuring Agreement," under which the policies provide coverage for "Loss on behalf of the Insureds resulting from an Employment Practices Claim first made against the Insureds during the Policy Period." **ECF Nos. 67** at 83 (2015 policy); **73-6** at 18 (2016 policy)**.** Thus, the Court must determine when an "Employment Practices Claim" is "first made" under the policies to identify which policy applies.

Both policies define "Employment Practices Claim," as, inter alia, "any" "formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the filing of a notice of charges, formal investigative order or similar document." **ECF Nos. 67** at 83 (2015 policy, Employment Practices Liability Coverage Part, Section II(C)(3)); **73-6** at 18 (2016 policy, same subdivision). In addition, the policies define "Employment Practices Wrongful Act" as "a Wrongful Act involving any: (1) wrongful dismissal, discharge or termination of employment . . . (3) employment discrimination, including discrimination based upon age . . . ." [5] **ECF Nos. 67** at 84, 115 (2015 policy, Employment Practices Liability Coverage Part, Section II(D), as amended by Endorsement No. 20); **73-6** at 19, 53 (2016 policy, same subdivision, as amended by Endorsement No. 23). Both policies also contain an "Interrelationship of Claims" provision that states, in relevant part, "All Claims based upon,

---

[5] A "Wrongful Act" is further defined in the policies as "any actual or alleged: (1) error, misstatement, misleading statement, act, omission, neglect or breach of duty; or (2) matter claimed against an Insured Person solely by reason of their serving in such capacity." **ECF Nos. 67** at 86 (2015 policy, Employment Practices Liability Coverage Part, Section II(O)) ; **73-6** at 21 (2016 policy, same).

arising from or in any way related to the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to be a single Claim first made on the earliest date that: (A) any of such Claims was first made, regardless of whether such date is before or during the Policy Period." **ECF Nos. 67** at 77 (2015 policy, Common Terms and Conditions, Section X); **73-6** at 12 (2016 policy, same).

The policies define an "Employment Practices Claim" in terms of specific actions taken against the employer, i.e., the filing of an EEOC charge, the filing of a civil complaint, receiving a written demand for damages, and etc. **ECF Nos. 67** at 83; **73-6** at 18. Thus, although the policies do not define the phrase "first made," based on the plain language of the policies, an Employment Practices Claim is "first made" against the insured when any of the events enumerated in the definition of "Employment Practices Claim" first occurs.

The first of those enumerated events to occur here was the October 8, 2015 filing of a discrimination charge by one of the plaintiffs before the EEOC and ADU. Additionally, the Court agrees with Twin City that the plaintiffs' claims are "interrelated," arising out of the same October 5, 2015 reduction in force and, therefore, the plaintiffs' individual claims are treated collectively under the policies as "first made" against Congar on October 8, 2015.[6] As a result, Congar's insurance claim falls within the 2015 policy's coverage period.

Congar's contrary interpretation undermines the plain language of the provisions cited above. Congar argues that nothing in the "Insuring Agreement" of either the 2015 or 2016 policy

---

[6] Congar does not seem to refute the interrelationship of plaintiffs' claims based on the October 5, 2015 reduction in force. *See* **ECF No. 73** at 9–10.

"limits or defines the scope of coverage to claims that are reported during the policy period (or at any time)." **ECF No. 73** at 13. And it argues that the 2016 policy should nonetheless apply because its General Counsel first learned of the plaintiffs' employment dispute during the 2016 policy period, on February 4, 2016. Congar relies on language appearing in an endorsement appended to each policy in support of its argument that "a 'condition precedent to coverage' is that 'the Insureds shall give the Insurer written notice of any Claim as soon as practicable after the Risk Manager or General Counsel *becomes aware of such Claim*.'" *Id.* at 4 (emphasis in original) (quoting **ECF Nos. 67** at 105 (Endorsement 11); **73-6** at 41 (Endorsement 12)). According to Congar, "[i]t follows that, under no circumstances, can a 'Claim' be deemed to have been 'first made' until *after* the Risk Manger or General Counsel is aware of that claim." **ECF No. 73** at 15 (emphasis in original). As a result, Congar asserts its insurance claim first arose on February 4, 2016, when its General Counsel became aware of the plaintiffs' employment dispute, thereby placing Congar's insurance claim within the 2016 policy period.

This argument is untenable. It ignores the language of the Insuring Agreement providing coverage for "an *Employment Practices* Claim first made *against* the Insureds during the Policy Period," not *insurance* claims first made *by* the insured. **ECF No. 67** at 83 (2015 policy) (emphasis added). Moreover, the import of the endorsement cited by Congar is to outline the requirements for proper notice under the policies, not to establish when a claim has accrued. Congar quotes from language appearing under the subheading "Notice of Claim." The full text of that section states,

> As a condition precedent to coverage under this Policy, the Insureds shall give the Insurer written notice of any Claim as soon as practicable after the Risk Manager or General Counsel becomes aware of such Claim, but in no event later than sixty (60) days after the termination of the Policy Period, or Extended Reporting Period as described in Section IX. Such notice shall specify the Coverage Part under which notice is being given.

**ECF Nos. 67** at 105; **73-6** at 41 (the "Notice Endorsement"). The "condition" that this language describes as a perquisite to coverage is that the insured give written notice of a claim no later than sixty days after the policy period expires. The provision indicates a preference for notice to be given "as soon as practicable," providing some leeway for the insured to, i.e., run a claim up the chain of command to the General Counsel or Risk Manager. Ultimately, however, coverage, is conditioned by this provision on the timing of the notice given, not on the subjective understanding of the General Counsel. Congar's interpretation of this language, making the General Counsel's knowledge a condition for coverage, could leave the policy indefinitely open-ended, thereby eviscerating the time limitation that notice be given "no later than sixty (60) days after the termination of the Policy Period."

The original, pre-endorsement Notice of Claim language better supports Congar's interpretation; the original Notice of Claim provision stated, in relevant part, "As a condition precedent to coverage under this Policy, the Insureds shall give the Insurer written notice of any Claim as soon as practicable, provided that such notice shall be given not later than sixty (60) days after any Manager becomes aware that such Claim has been made." **ECF Nos. 67** at 76–77; **73-6** at 11–12. "Manager" is defined in the policy as including the General Counsel and, under

the former Notice of Claim phrasing, coverage is arguably conditioned upon the General Counsel's subjective awareness of a claim. *See* **ECF Nos. 67** at 73; **73-6** at 8. This notice language, however, was proactively deleted from the policy for all three coverage years available in the record and replaced by the above-quoted Notice Endorsement. *See* **ECF Nos. 67** at 16–17, 42 (original language and Endorsement 8 in the 2014 policy); **67** at 76–77, 105 (original language and Endorsement 11 in the 2015 policy); **73-6** at 11–12, 41 (original language and Endorsement 12 in the 2016 policy). Accordingly, the Notice Endorsement describes when notice is timely and does not affect whether the employment dispute for which Congar seeks insurance coverage was "first made" during the 2015 policy period or the 2016 policy period.

**B. Congar's Notice Under the 2015 Policy was Untimely.**

The Notice Endorsement to the 2015 Policy requires the insured to provide the insurer with written notice of a claim "in no event later than sixty (60) days after the termination of the Policy Period." **ECF No. 67** at 105. The 2015 policy period expired on January 31, 2016, making Congar's written notice of its claim due by April 1, 2016. *Id.* at 67. Congar provided written notice on July 20, 2016, more than one-hundred days after the notice period closed.

The Court acknowledges that the notice of claim language in the Notice Endorsement purports to amend only Section VIII(A) of the "Common Terms and Conditions" section of the 2015 policy, while the 2015 policy contains the pre-endorsement notice language in two other locations that are not explicitly amended by the Endorsement. The "Declaration" paragraph on the first page of the policy, which is reiterated in almost identical terms in the introductory text

at the top of the "Common Terms and Conditions" section, discusses the issue of notice under the policy (the "Declaration provisions").[7] **ECF No. 67** at 67, 72. Like the pre-endorsement notice of claim provision discussed above, the Declaration provisions require an insured to give written notice to the insurer "not later than 60 days after any Manager becomes aware that such claim has been made." *Id.* Florida law requires any inconsistency between an endorsement and the policy to be construed in favor of the endorsement. *Allstate Fire & Cas. Ins. Co. v. Hradecky*, 208 So.3d 184, 187 (Fla. Dist. Ct. App. 2016) (collecting cases and stating, "The law in Florida is clear that to the extent an endorsement is inconsistent with the body of the policy, the endorsement controls"); *accord Tudor Ins. Co. v. American Cas. Co. of Reading Pa.*, 3:15CV166-MCR/CJK, 2017 WL 1217183, at *5 (N.D. Fla. Mar. 31, 2017). Additionally, any inconsistency here has no bearing on Congar's claim. Congar's General Counsel became aware of the claim on February 4, 2016, making notice due by April 4, 2016, under the framework described in the Declaration provisions. Congar's July 20, 2016 notice was still over one-hundred days late under this calculation.

**C. Congar's Defenses are Unpersuasive.**

Congar raises two defenses to rescue its otherwise untimely claim from Twin City's denial of coverage under the 2015 policy. Congar raises the "notice-prejudice rule" in its defense, contending that if its notice is deemed untimely, the untimeliness is not dispositive because

---

[7] Congar acknowledges this discrepancy and asserts that the Notice Endorsement amends the Declaration provisions, as well. **ECF No. 87** at 2.

Case 3:16-cv-02008-ADC   Document 88   Filed 03/30/18   Page 14 of 19

Civil No. 16-2008 (ADC)                                                                                      Page 14

Twin City was not prejudiced by it. **ECF No. 73** at 5–6, 26–27. Congar also argues that Twin City waived its "late notice" defense to coverage by failing to timely issue a reservation of rights letter in accordance with Florida's Claims Administration Statute ("CAS"). *Id.* at 18–26. Twin City argues that both defenses fail because they are inapplicable to "claims-made policies" like the 2015 policy. **ECF No. 83** at 6–10.

**1. The 2015 Policy is a Claims-Made Policy.**

Under Florida law, a claims-made insurance policy "only protects the insured against claims made and reported during the policy period. . . . If the claim is not reported during the policy period, no liability attaches." *Pantropic Power Prods., Inc. v. Fireman's Fund Ins. Co.*, 141 F.Supp.2d 1366, 1369 (S.D. Fla. 2001) (emphasis and citations omitted) (using interchangeably the phrases "claims-made policy" and "claims-made-and-reported policy"); *accord Cast Steel Prods., Inc. v. Admiral Ins. Co.*, 348 F.3d 1298, 1300 (11th Cir. 2003). "The essence, then, of a claims-made policy is notice to the carrier *within the policy period*." *Gulf Ins. Co. v. Dolan, Fertig and Curtis*, 433 So.2d 512, 514 (Fla. 1983) (emphasis added) (drawing no distinction between claims-made and claims-made-and-reported policy).. Unlike claims-made policies, occurrence policies expose insurers "to indefinite future liability," covering "acts which occur in the life of the policy, irrespective of when the claims are asserted against the insured." *Pantropic*, 141 F.Supp.2d at 1369. "An occurrence policy is a policy in which the coverage is effective if the negligent act or omission occurs within the policy period, regardless of the date of discovery or the date the claim is made or asserted." *Gulf Ins.*, 433 So.2d at 514.

Here, the 2015 policy clearly does not purport to expose the insurer "to indefinite future liability." *See Pantropic*, 141 F.Supp.2d at 1369. The Notice Endorsement and the Declaration provisions plainly establish the 2015 policy as a claims-made policy. The Declaration provisions simply state, "Coverage elections provides claims made coverage." **ECF No. 67** at 72; *see also id.* at 67 (using slightly different wording). Any contrary language is overridden by the inclusion of the Notice Endorsement. *See Allstate Fire*, 208 So.3d at 187. The Notice Endorsement requires that notice of a claim, "[a]s a condition precedent to coverage," be given "as soon as practicable after the Risk Manager or General Counsel becomes aware of such Claim, but in no event later than sixty (60) days after the termination of the Policy Period." **ECF No. 67** at 105. The Notice Endorsement language effectively mirrors the language the *Pantropic* Court cited as creating a claims-made policy; the language in the *Pantropic* policy "limited coverage to claims first made against the insured during the policy period and reported to the insurer 'as soon as practicable after the claim is made (but in no event more than 60 days following the end of the policy period).'" *See Pantropic*, 141 F.Supp.2d at 1368. That the 2015 policy, like the policy in *Pantropic*, contains a sixty-day post-policy grace period for notice purposes does not undermine the claims-made hallmark that notice occur within the specified timeframe to trigger coverage; indeed, sixty-day grace periods are a common attribute to claims-made policies. *See, e.g., Gulf Ins.*, 433 So.2d at 516 (collecting cases). Thus, the 2015 policy is a claims-made policy.

**2. The Notice-Prejudice Rule Does Not Apply to this Claims-Made Policy.**

Congar argues that Twin City cannot "deny coverage based on a notice condition" because it was not "actually prejudiced" by the timing of Congar's notice. **ECF No. 73** at 5. For support, it cites *Tiedtke v. Fidelity & Cas. Co. of N.Y.*, 222 So.2d 206, 209 (Fla. 1969) ("[T]he proper interpretation of the effect of prejudice in delayed notice cases [is] that while prejudice to the insurer is presumed, if the insured can demonstrate that the insurer has not been prejudiced thereby, then the insurer will not be relieved of liability merely by a showing that notice was not given 'as soon as practicable.'"), and *Bankers Ins. Co. v. Macias*, 475 So.2d 1216, 1218 (Fla. 1985) ("If the insured breaches the notice provision, prejudice to the insurer will be presumed, but may be rebutted by a showing that the insurer has not been prejudiced by the lack of notice."). **ECF No. 73** at 5–6. Congar argues that Twin City's months-long investigation into the claim after receiving notice demonstrates that it was not prejudiced by the notice's timing. *Id.* at 6.

Florida courts have "rejected applicability of the [notice-prejudice] rule to claims-made policies, observing that any extension of the reporting period would 'negate[] the inherent difference between the two contract types,'" i.e. claims-made policies and occurrence policies. *Pantropic*, 141 F.Supp.2d at 1369 (second alteration in original) (quoting *Gulf Ins. Co.*, 433 So.2d at 515). The Florida Supreme Court explained that the effect of a court "giving an extension of reporting time after the expiration of the policy period" on a claims-made policy, such as that envisioned by the notice-prejudice rule, would be "tantamount to an extension of coverage to the insured gratis," akin to a court-ordered "rewrite[ of] the contract between the two parties," and is simply something that courts "cannot and will not do." *Gulf Ins. Co.*, 433 So.2d at 515–16

(emphasis omitted). In other words, "a prejudice analysis is not reached under the straightforward terms of" a claims-made policy because "prejudice is not a factor . . . that can extend coverage that has [otherwise] expired." *See The Doctors Co. v. Health Mgmt. Assocs., Inc.*, 943 So.2d 807, 810–11 (Fla. Dist. Ct. App. 2006); *accord Pantropic*, 141 F.Supp.2d at 1369. Accordingly, Congar's defense under the notice-prejudice rule necessarily fails to rescue its untimely notice under the claims-made 2015 policy.

### 3. The CAS Does Not Apply to this Claims-Made Policy.

Last, Congar asserts that "Twin City's denial of coverage under the 2015 Policy based on alleged non-compliance with the notice 'condition' is barred by the Florida Claims Administration Statute," (the "CAS"), Fla. Stat. § 627.426. **ECF No. 73** at 18–19. Twin City argues that the CAS does not apply here because untimely notice is not a coverage defense under a claims made policy; rather, timely notice is a prerequisite for coverage. **ECF No. 83** at 6–7. The Court agrees with Twin City.

The CAS requires, among other things, that an insurer provide notice of coverage defenses in a reservation of rights letter within a specified timeframe, lest the insurer risk waiving the coverage defense. Fla. Stat. § 627.426(2). The CAS "in effect works an estoppel" to "prevent a forfeiture of insurance coverage," but it does not "create or extend coverage." *AIU Ins. Co. v. Block Marina Inv., Inc.*, 544 So.2d 998, 1000 (Fla. 1989). Thus, a "'coverage defense' under [the CAS] 'means a defense to coverage that otherwise exists.'" *Embroidme.com, Inc. v.*

*Travelers Prop. Cas. Co. of Am.*, 992 F.Supp.2d 1259, 1264 (S.D. Fla. 2014) (quoting *AIU Ins.*, 544 So.2d at 1000).

In general, "the failure to timely report a claim is a classic coverage defense [that] must be [included] in the reservation of rights letter." *Gemini II Ltd. v. Mesa Underwriters Specialty Ins. Co.*, 592 Fed. Appx. 803, 809 (11th Cir. 2014) (per curiam) (citation and internal quotation marks omitted). However, under a claims-made policy, the availability of coverage "depends on the claim being discovered and reported to the insurer during the policy period." *Country Manors Ass'n, Inc. v. Master Antenna Sys., Inc.*, 534 So.2d 1187, 1193 (Fla. Dist. Ct. App. 1988). Thus, untimely notice is not a coverage defense under a claims-made policy, but an acknowledgement that coverage does not exist. *See id.* ("An insurer does not assert a 'coverage defense' where there was no coverage in the first place."). To interpret the CAS otherwise, i.e., as foreclosing an insurer from denying claims-made coverage based on untimely notice, "has the effect of rewriting an insurance policy." *See AIU Ins.*, 544 So.2d at 1000.

Here, the effect of extending coverage for Congar based on its CAS defense would be to "resurrect coverage under a policy" that was no longer in effect by the time Congar provided notice. Congar's untimely notice is not a defense to coverage here; it is an explanation as to why coverage is unavailable, namely, because the policy and its sixty-day reporting grace period had expired. Accordingly, the CAS does not apply to this case.

## IV. Conclusion

The 2015 policy applies to this case. The underlying employment dispute involves interrelated claims that were "first made" against Congar on October 8, 2015, the date on which the first plaintiff filed a complaint with the EEOC and ADU. The 2015 policy is a claims-made policy, limiting coverage to claims that are both first made against the insured during the policy period and reported to the insurer no later than sixty days after the expiration of the policy period. The notice-prejudice rule and the CAS are not applicable to this claims-made policy. Accordingly, Twin City's motion for summary judgment at **ECF No. 66** is **GRANTED**. Congar's cross-motion for summary judgment at **ECF No. 73** is **DENIED.** This case is hereby dismissed. Clerk of Court shall enter Judgment accordingly.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 30th day of March, 2018.

**S/AIDA M. DELGADO-COLÓN**
**Chief United States District Judge**